# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

REALTIME DATA LLC d/b/a IXO,

          Plaintiff,

      v.

KAMINARIO, INC.,

          Defendant.

C.A. No. 19-350-CFC

## PLAINTIFF REALTIME DATA LLC'S ANSWERING BRIEF
## IN OPPOSITION TO DEFENDANTS' MOTION (D.I. 23) TO DISMISS
## FOR FAILURE TO STATE A CLAIM

September 16, 2019

OF COUNSEL:

Marc A. Fenster
Brian D. Ledahl
Reza Mirzaie
Paul A. Kroeger
C. Jay Chung
RUSS, AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
(310) 826-7474
Los Angeles, CA 90025-1031
mfenster@raklaw.com
bledahl@raklaw.com
rmirzaie@raklaw.com
pkroeger@raklaw.com
jchung@raklaw.com

BAYARD, P.A.

Stephen B. Brauerman (No. 4952)
600 N. King Street, Suite 400
Wilmington, DE 19801
(302) 655-5000
sbrauerman@bayardlaw.com

*Attorneys for Plaintiff Realtime Data LLC*

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION................................................................................1

II.   MULTIPLE COURTS HAVE UPHELD THE PATENTABILITY OF
     REALTIME'S PATENTS UNDER 35 U.S.C. § 101........................2

III.  LEGAL STANDARD.........................................................................3

IV.  DEFENDANT HAS NOT MET ITS BURDEN TO CLEARLY AND
     CONVINCINGLY ESTABLISH THAT THE CLAIMS ARE INVALID
     UNDER § 101 ...................................................................................4

    A.  Defendant Cannot Show that the Claims Are Directed to an
       Abstract Idea Under *Alice* Step 1.........................................6

       1. It is clear from the faces of the patents that they claim
          technological solutions to technological problems
          relating to digital data compression. ...........................6

       2. Defendant's flawed arguments mischaracterize the law and
          the claims. ...................................................................11

          a.     Defendant's arguments regarding the '825 patent
              are flawed........................................................11

          b.     Defendant's arguments regarding the '751
              and '458 patents are flawed.............................20

    B.  Defendant Also Cannot Show That the Claims Lack Inventive
       Concept Under *Alice* Step 2. ...............................................27

       1. The analysis under *Alice* step 2 involves questions of fact.............27

       2. The intrinsic record confirms that the claimed inventions
          involve unconventional technological solutions under
          step 2. .........................................................................30

       3. Defendant's conclusory arguments contravene Federal
          Circuit precedent and must be rejected.....................................33

4. Defendant has not clearly and convincingly shown that *all* of the claims are ineligible ............................................................35

C.  As Set Forth in Realtime's Complaint, Proper Construction of the Claims Confirms that the Claims Are Patent Eligible Under § 101 ...................................................................................................36

☐   "compressing" / "compressed" / "compression": [representing / represented / representation of] data with fewer bits ..............................................................36

☐   "descriptor": recognizable digital data ..........................36

☐   "data stream": one or more data blocks transmitted in sequence......................................................................36

☐   "data block": a single unit of data, which may range in size from individual bits through complete files or collection of multiple files..................................36

☐   "analyze": directly examine...........................................36

V.   CONCLUSION ................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  F.3d, 2018 WL 843288 (Fed. Cir. Feb. 14, 2018) .............................. 4, 28, 29, 35

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
  728 F.3d 1336 ...................................................................................3

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2010).......................................................... 4,6, 5, 27

*Apple, Inc. v. Ameranth, Inc.*,
  842 F.3d 1229 (Fed. Cir. 2016) ........................................................19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...........................................................................3

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) ........................................... 5, 27, 33, 35

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...........................................................................3

*Berkheimer v. HP Inc.*,
  F.3d --, 2018 WL 774096 (Fed. Cir. Feb. 8, 2018) ............................27

*BSG Tech LLC v. Buyseasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018) ........................................................16

*Core Wireless Licensing v. LG Elecs., Inc.*,
  F.3d, 2018 WL 542672, *4 (Fed. Cir. Jan. 25, 2018). .........................8

*DDR v. Hotels.com LP*,
  773 F.3d 1245 (Fed. Cir. 2014). ........................................................7

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) ........................................................19

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) ................................................ *passim*

*Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) ................................................. 18, 36

*FairWarning IP v. Iatric Sys., Inc.*,
  839 F.3d 1089 (Fed. Cir. 2016) ........................................................19

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
   F.3d, 2018 WL 341882 (Fed. Cir. Jan. 10, 2018). ..............................................6

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
   850 F.3d 1332 (Fed. Cir. 2017) ........................................................................19

*Interval Licensing LLC v. AOL, Inc.*,
   896 F.3d 1335 (Fed. Cir. 2018) ........................................................................19

*JSDQ Mesh Techs. LLC v. Fluidmesh Networks, LLC*,
   No. 16-CV-212-GMS, 2016 WL 4639140 (D. Del. Sept. 6, 2016) ......................4

*MAZ Encryption Techs. LLC v. Blackberry Corp.*,
   No. 13-304-LPS, 2016 WL 5661981 (D. Del. Sept. 29, 2016)...........................35

*McGinley v. Franklin Sports, Inc.*,
   262 F.3d 1339 (Fed. Cir. 2001) ........................................................................27

*McRO, Inc. v. Bandai Namco Games America, Inc*.,
   837 F.3d 1299 (Fed. Cir. 2016) ........................................................................14

*Microsoft Corp. v. i4i Ltd. P'ship*,
   131 S. Ct. 2238 (2011).........................................................................................3

*Realtime Data LLC v. Actian Corp. et al.*,
   Case No. 15-cv-463-RWS-JDL, Dkt. No. 184 (E.D. Tex. Nov. 30, 2015) .....3, 37

*RecogniCorp, LLC v. Nintendo Co.*,
   855 F.3d 1322 (Fed. Cir. 2017) ................................................................... 17, 36

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.*,
   873 F.3d 1364 (Fed. Cir. 2017) ........................................................................19

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
   874 F.3d 1329 (Fed. Cir. 2017) ........................................................................19

*Verint Sys. Inc. v. Red Box Recorders Ltd.,*
   226 F. Supp. 3d 190 (S.D.N.Y. 2016) ...............................................................12

*Visual Memory LLC v. Nvidia Corp.*,
   867 F.3d 1253 (Fed. Cir. 2017)............................................................... *passim*

*Voit Techs., LLC v. Del-Ton, Inc.*,
   757 F. App'x 1000 (Fed. Cir. 2019)...................................................................19

## I.      INTRODUCTION

The claims at issue here are not abstract, but rather are limited to particularized technological solutions that improve computer capabilities—*e.g.*, digital data compression systems to increase the capacity of a computer system to store or transfer data more efficiently. The claims describe specific ways (*e.g.*, using state machine, data accelerator, performing analysis that is not based solely on a descriptor, etc.) to make this happen. Moreover, the claims require much more than well-understood, routine, conventional activities for solving the then-existing problems in the field of digital-data compression. Indeed, the intrinsic record, including the patents' specifications, demonstrate this, which at least raises factual issues that preclude dismissal.

Related patents have gone through § 101 scrutiny before in multiple districts. For example, a Texas court ruled that the '728, '530, '908, and '204 patents, *all* of which are related to—and share specifications with—patents asserted in this case, are "inventive" and "directed to patent eligible subject matter" because they disclose "specific improvement[s] in computer capabilities" and "specify direct ways to fix issues in data transmission." (Ex. 1.) In that order, the court expressly rejected the very same arguments that Defendant asserts here, including that the inventions require only conventional computer technology and focus only on desired results. A Massachusetts court likewise rejected a similar attempt to invalidate Realtime's

patents under § 101 and adopted the Texas court's ruling in full. (Ex. 4.)[1] As these rulings show, the claims are patent-eligible. At minimum, there are fact issues, including issues relating to claim construction, that preclude dismissal.

Because Defendant has failed to meet the heightened burden to show that the *only* plausible reading of the patents must be that there is clear and convincing evidence of ineligibility, its motion should be denied.

## II.   MULTIPLE COURTS HAVE UPHELD THE PATENTABILITY OF REALTIME'S PATENTS UNDER 35 U.S.C. § 101

In a detailed, twenty-two-page opinion issued on September 20, 2017, Magistrate Judge Love in the Eastern District of Texas issued a Report and Recommendation finding the claims of the '728, '530, '908, and '204 patents to be eligible under § 101. (Ex. 1 (*Realtime Data LLC v. Carbonite, Inc.*, No. 6:17-cv-0012, D.I. 70 (E.D. Tex. Sept. 20, 2017).) The '728 patent is in the same family as—and shares a specification with—the asserted '825 patent; the '530 and '908 patents are in the same family as—and share a specification with—the asserted '458 patent; and the '204 patent is in the same family as—and shares a specification with—the asserted '751 patent.

On March 7, 2018, "[a]fter careful consideration," District Judge Young in Massachusetts adopted in full Judge Love's rulings in full. (Ex. 4.) These courts

---

[1] Moreover, the '728, '530, and '908 patents were confirmed to be patentable in Final Written Decisions by the PTAB after adversarial *inter partes* reviews. (Exs. 5–7.)

correctly concluded that the patents are not abstract but are directed to patent eligible subject matter, and that they are also inventive. Consistent with these rulings, two judges in Texas also denied two other § 101 motions involving two of the three patent families at issue here.[2]

## III.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Viewing them in the light most favorable to the plaintiffs, well-pleaded factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). "Patent eligibility under § 101 presents an issue of law . . . contain[ing] underlying factual issues." *Accenture Global Servs. v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340–41 (Fed. Cir. 2013). And because the presumption of patent validity applies to the § 101 analysis, *see Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2245 (2011), "[a]t the motion to dismiss stage a

---

[2] In *Realtime Data LLC v. Actian Corp.*, No. 15-cv-463 (E.D. Tex.) ("*Actian*"), which involved the '530 and '908 patents related to the asserted '458 patent, and Pat. Nos. 7,378,992 and 8,643,513, which are related to the asserted '825 patent, Magistrate Judge Love held that "an assessment of the claims at issue—by a careful reading of the claims themselves—does not clearly reveal that the patents are abstract." (Ex. 2 at 11.) District Judge Schroeder adopted these findings and further held that under Realtime's view that the claims are directed to the compression of digital data (which the Court is required to accept as true on a motion to dismiss), defendants' argument that the patents are directed to an abstract idea "would fail" because the patents "provide technological solutions to problems arising specifically in the realm of computer technology." (Ex. 3 at 2.). Judge Schroeder overruled each of defendant's objections to Judge Love's findings, declaring that "the Court is not persuaded by Defendants' oversimplification of Plaintiff's patents." (*Id.* at 2.)

patent claim can be found directed towards patent-ineligible subject matter if the *only plausible reading* of the patent must be that there is clear and convincing evidence of ineligibility." *JSDQ Mesh Techs. LLC v. Fluidmesh Networks, LLC*, No. 16-CV-212-GMS, 2016 WL 4639140, at *1 (D. Del. Sept. 6, 2016).[3] The Federal Circuit has made clear that patent eligibility can be determined at the Rule 12(b)(6) "*only when* there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).

## IV. DEFENDANT HAS NOT MET ITS BURDEN TO CLEARLY AND CONVINCINGLY ESTABLISH THAT THE CLAIMS ARE INVALID UNDER § 101

There are three narrow exceptions to § 101's broad patent-eligibility principles: laws of nature, physical phenomena, and abstract ideas. *Bilski v. Kappos*, 561 U.S. 593, 594 (2010). The Supreme Court has warned, however, that interpreting these exceptions too broadly could "swallow all of patent law" because "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2010).

In *Alice*, the Supreme Court articulated a two-step analysis for determining patent eligibility under § 101. First, the court must determine "whether the claims at

---

[3] All emphases added unless otherwise noted.

issue are directed to [a] patent-ineligible concept," such as an abstract idea. *Alice*, 134 S. Ct. at 2355. Although previously often handled in a summary manner, the Federal Circuit has recently emphasized the importance of this step of the analysis, explaining that the first *Alice* step "plainly contemplates that the first step of the inquiry is a meaningful one, i.e., that a substantial class of claims are *not* directed to a patent-ineligible concept." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016) (emphasis in original).

If the claims are directed to an abstract idea, the second step of the *Alice* analysis calls for the court to "consider the elements of each claim both individually and 'as an ordered combination' to determine whether [the claims contain] an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself.'" *Alice*, 134 S. Ct. at 2355. Inventions that "improve[] an existing technological process" or "solve[] a technological problem in 'conventional industry practice'" are patent eligible. *Id.* at 2358. Furthermore, a defendant *cannot* prevail on this step simply by showing that each individual claim element was "known in the art" or conventional. *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016). Even where individual elements are conventional technologies, the specific arrangement of conventional technologies can also form the inventive concept. *Id.* at 1350.

**A.    Defendant Cannot Show that the Claims Are Directed to an Abstract Idea Under *Alice* Step 1.**

**1.    It is clear from the faces of the patents that they claim technological solutions to technological problems relating to digital data compression.**

Under the Supreme Court's *Alice* framework, claims that "improve[] an existing technological process" or "solve a technological problem in 'conventional industry practice'" are patent eligible. *Alice*, 134 S. Ct. at 2358. The Federal Circuit has applied these standards in several controlling cases to uphold the patentability of claims challenged as abstract.

In *Finjan*, the Federal Circuit held eligible a patent for identifying suspicious computer virus. *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303–06 (Fed. Cir. 2018). Finjan's claim recited only three steps: (a) "receiving" computer program; (2) "generating … security profile that identifies suspicious code;" and (3) "linking" the security profile to the computer program. *Id.* The claim did not specify *how* to "identif[y] suspicious code." *Id.* at 1303. While acknowledging that prior Federal Circuit precedent has held that "virus screening," by itself, is an abstract idea, the court nevertheless held that Finjan's patent claim was not abstract because it was not directed to just any "virus screening," but instead limited to a particular type of virus screening, which constituted improvement in computer functionality. In so holding, the court rejected the same argument advanced by Defendant here, namely, that the claims "do not sufficiently describe how to implement" any idea.

*Id.* at 1305. On this point, the court held that the three recited steps were all that was needed to render the claim patent-eligible. *Id.*

In *Enfish*, the Federal Circuit reversed an ineligibility ruling on a database patent, which the district court described as being directed to "storing, organizing, and retrieving memory in a logical table." *Enfish*, 822 F.3d at 1337. The Federal Circuit held that "describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to §101 swallow the rule." *Id.* It further criticized the district court's analysis for "downplay[ing] the invention's benefits" disclosed in the specification. *Id.* at 1337–38. Because the claims were "**designed to improve the way a computer stores and retrieves data in memory**," they were "directed to a specific implementation of a solution to a problem in the software arts" and, thus, "not directed to an abstract idea." *Id.* at 1339.

Similarly, in *DDR Holdings*, the claims addressed "the problem of retaining website visitors." *DDR Holdings LLC v. Hotels.com LP*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). Despite being directed to e-commerce, the court held that these claims "stand apart" from abstract claims "because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *Id.* Instead, "the claims recite[d] an invention that is not merely the routine or conventional use of the Internet." *Id.* at

1259. Thus, they were eligible because the patented claims were "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* Notably, in *Actian*, Judge Schroeder specifically found that Realtime's patents "are more analogous to those in *DDR Holdings* because they provide technological solutions to problems arising specifically in the realm of computer technology." (Ex. 3 at 2.)

In *Visual Memory*, the claims recited "memory" and "processor" with "operational characteristics" which "determines a type of data." *Visual Memory LLC v. Nvidia*, 867 F.3d 1253, 1257 (Fed. Cir. 2017). The court rejected defendant's argument that the claims "are directed to no more than a desired result" or that the patent claims "nothing more than a black box." *Id.* at 1260–61. The court cautioned against over-simplifying the claims, and held that they were directed to "improvements to computer functionality" as opposed to "economic or other tasks for which a computer is used in its ordinary capacity." *Id.* at 1258–61.

In *Core Wireless*, the Federal Circuit affirmed eligibility of a patent about summarizing and presenting information in electronic devices. *Core Wireless Licensing v. LG Elecs., Inc.*, 880 F.3d 1356, 1362 (Fed. Cir. 2018). In so doing, the court rejected defendants' failure to acknowledge key claim elements and cautioned that courts "must be mindful that all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* at 1361.

It held that the patent claimed "an improvement in the functioning of computers" (*id.* at 1363) because the claims were limited "to a ***particular*** manner of summarizing and presenting information in electronic devices." *Id.* at 1362.

As in *Finjan, Enfish, DDR*, *Visual Memory*, and *Core Wireless*, the claimed inventions here provide particular technological solutions to overcome technological problems specific to the field of digital data compression. The patents themselves state they are directed to problems unique to the realm of digital data, a form of data "not easily recognizable to humans in native form." (*E.g.*, '458 Patent at 1:24-59; '825 Patent at 1:49–65.) In this realm, the patents describe particular combinations of steps or structural computer components to help improve detection and exploitation of redundancies, for example, in the incoming strings of computer "1s" and "0s."

The patents teach specific improvements to the function of the computer parts themselves, such as computer memory and computer-data storage and retrieval mechanisms. For example, the '825 patent describes various problems in the conventional art, including the "content sensitive behavior" of various compression techniques and the "extremely large number of application programs" and data types or content. (*E.g.,* '825 Patent at 2:26–3:15.) The '825 patent solved these problems by providing systems utilizing two digital-data compression techniques (*e.g.*, content dependent and content independent) to compress/decompress data blocks

based on analysis of the specific content of data. And the patents overcame the issue of relying solely on a descriptor (*e.g.*, file extensions such as ".doc," ".txt," etc.) by requiring a direct examination of the digital-data payload rather than examining just the descriptor. (*E.g.*, '825 Patent claim 1.) The '458 patent solved problems in the conventional digital data compression arts by providing systems utilizing *two different* lossless dictionary compression encoders. (*E.g.*, '458 Patent claim 1.) And the '751 patent solved problems in the conventional digital-data compression by utilizing a state machine to compress data blocks based on an analysis of the specific content of the data being encoded. (*E.g.*, '751 Patent claim 1.) The claimed solutions are not abstract. They are necessarily rooted in computer technology and aimed at solving limitations in then-existing digital-data compression.

In fact, applying the Federal Circuit's analysis, Realtime's patents present a clearer case of subject-matter eligibility than those held eligible in *DDR Holdings*. In that case, after analyzing the claims, which were directed to the "look and feel" of websites, the court held that, although "the [asserted] claims do not recite an invention as technologically complex as an improved, particularized method of **digital data compression**," they were nonetheless patent eligible. 773 F.3d at 1259. The claims here present precisely the type of invention the Federal Circuit recognized as unquestionably patent eligible—particularized systems and methods of digital data compression.

10

Indeed, applying the Supreme Court and Federal Circuit precedents, courts in Texas and Massachusetts have held that related patents with substantially identical specifications are eligible  under § 101. (Ex. 1–4.) For instance, a Texas court found that the '728, '530, '908, and '204 patents asserted here are patent eligible in a Report and Recommendation by Magistrate Judge Love. (Ex. 1.) The case was transferred to the District of Massachusetts, where Judge Young adopted Judge Love's findings in full "[a]fter careful consideration." (Ex. 4.) These courts rejected the same arguments advanced by Defendant here, including arguments about "generic components" (Ex. 1 at 9, 11, 15, 17) and about claims purportedly reciting "only desired results" (*e.g., id.* at 12, 17, 20, 21). The courts expressly rejected the defendants' oversimplification of the claims and held that the patents are eligible and inventive. (*Id.*)[4]

## 2. Defendant's flawed arguments mischaracterize the law and the claims.

### a. Defendant's arguments regarding the '825 patent are flawed.

Defendant asserts that the '825 patent claims are directed to "selecting and performing a data compression technique based on the attributes of the data being compressed." (Mot. at 12–13.) But even accepting this oversimplified

---

[4] In addition, two judges in Texas denied two other § 101 motions involving two of the three patent families at issue here. (*See* Exs. 2, 3.) Defendant's motion fails to acknowledge, much less distinguish, any of these adverse rulings contradicting its § 101 arguments.

characterization of the claims[5], it is clear that they are directed to particular methods and systems for digital-data compression, and thus cannot be abstract. Indeed, even the key, summary-form aspects of the inventions are directed to technological solutions: systems of digital data compression/decompression utilizing two encoders (*e.g.*, content dependent and content independent) to compress/decompress data blocks based on an analysis of the specific content of the data. Defendant provides no authority for its conclusory assertion that "compression is a long-practiced activity." (Mot. at 13.) And regardless, the Federal Circuit in *DDR Holdings* specifically pointed out that an "improved, particularized method of digital data compression," such as that claimed in the '825 patent, is a prime example of the type of claim that would *not* be abstract. 773 F.3d at 1259; *see also Enfish*, 822 F.3d at 1339 (claims directed to "improv[ing] the way a computer stores and retrieves data in memory" not abstract).

Defendant's argument that the claims utilize generic computer functions and components likewise fails. The Federal Circuit has repeatedly rejected the notion that the disclosure of conventional computing elements "dooms the claims." *Enfish*, 822 F.3d at 1338; *see also Visual Memory*, 867 F.3d at 1262 (a "patent's use of

---

[5] *See Verint Sys. Inc. v. Red Box Recorders Ltd.,* 226 F. Supp. 3d 190, 192 (S.D.N.Y. 2016) ("Many recent motions seeking determinations of patent ineligibility suffer from such reductionist simplicity—from characterizing as simply a mousetrap that which is in fact a better mousetrap. Courts faced with such motions must scrutinize reductive descriptions with great care.").

conventional computer components" not "fatal to patent eligibility"). Where, as here, the claims do not simply "add general-purpose computer components to a fundamental economic practice or mathematical equation," but rather are directed to specific improvement in computer functionality, they are not abstract. *Id.* at 1338–39.

For example, as expressly discussed in the patent itself, the '825 patent specifically addresses limitations and problems arising in the realm of compressing "[d]iffuse digital data" which is "a representation of data that . . . is typically not easily recognizable to humans in its native form." ('825 Patent at 1:44-51; *see also id.* at 3:49-58 (explaining that the '825 patent "address[es] limitations in conventional data compression techniques" by "providing fast and efficient data compression using a combination of content independent data compression and content dependent data compression").)[6] This compression is achieved using a plurality of encoders and compression techniques and chooses a compression technique based on the data type. (*Id.* at 3:61-67.) This "specific implementation of a solution to a problem in the software arts" is anything but abstract. *Enfish*, 822

---

[6] Other patents filed by well-known technology companies likewise acknowledge technological problems with computer capacity and that there is still a need for more efficient compression systems. *See, e.g.*, U.S. Pat. No. 9,026,568 at 2:43-47 (filed by Altera in 2012; "In order to better meet the requirements of higher speed data transfer, reduced memory utilization and minimal computation in many computing applications, a need exists for computationally efficient compression and decompression."); U.S. Pat. No. 9,026,568 at 2:43–47 (filed by Western Digital in 2013; "It is desirable to provide mechanisms and architectures for increasing capacity, reliability, and performance of data storage systems.").

F.3d at 1339; *see also* Ex. 3 at 2 (finding that under Realtime's proposed constructions, Realtime's patents are "more analogous to those in *DDR Holdings* because they provide technological solutions to problems arising specifically in the realm of computer technology"); Ex. 1 (finding that "[t]he '728 Patent [which is related to and shares a specification with the '825 patent] is directed to patent eligible subject matter because it discloses a specific improvement in computer capabilities"); *McRO, Inc. v. Bandai Namco Games America, Inc*., 837 F.3d 1299, 1315 (Fed. Cir. 2016) (rejecting argument that inventions "simply use a computer as a tool" and holding patents eligible because claims "focused on a specific asserted improvement in computer animation, *i.e.*, the automatic use of rules of a particular type.").

Defendant's assertion that the patent claims merely utilize results-based language without describing how to achieve those results improperly ignores key aspects of the various claims. *See McRO*, 837 F.3d at 1313 ("Courts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claim."). For example, claim 1 of the '825 patent recites highly specific steps including determining whether or not a parameter or attribute of data within a data block is identified for the data block wherein the determining is not based solely on a descriptor that is indicative of the parameter or attribute of the data within the data block, and compressing the data

using two different encoders based on the determined parameter or attribute, among other things. The dependent claims contain additional limitations, including "transmitting a data token indicative of the compression utilized to provide the compressed data block" (claim 3), fixing the size of the data block (claim 8), utilizing a lossless encoder (claim 12), and utilizing a Lempel-Ziv encoder (claim 14). *See, e.g.*, *Visual Memory*, 867 F.3d at 1257, 1260–61 (upholding patentability of comparable claim and rejecting defendant's argument that the patent does not "describe how to implement the 'programmable operational characteristic' and requires someone else to supply the innovative programming effort"); *Finjan*, 879 F.3d at 1305 (holding claims recited more than a mere result where they recited "specific steps—generating a security profile that identifies suspicious code and linking it to a downloadable—that accomplish the desired result").

Contrary to Defendant's assertions, these are not processes that can be performed mentally by humans. Defendant does not even attempt to explain how the human mind could possibly compress digital data based on attributes of the data. Instead, Defendant merely string cites various cases that have nothing to do with digital data compression, but rather are more generally directed to collecting and recognizing data. (*See* Mot. at 15–16.) Indeed, in the *Symantec* case heavily relied on by Defendant, which concerned claims directed to screening and routing emails, the Federal Circuit specifically contrasted those claims with claims directed to

15

"digital data compression," the latter of which are unquestionably not abstract. *Symantec*, 838 F.3d at 1315.

The other cases cited by Defendant are likewise distinguishable. For example, Defendant cites *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1287 (Fed. Cir. 2018) in arguing that the limitations of the '825 patent claims (e.g., determining a parameter or attribute of the data not based solely on a descriptor of the parameter or attribute) are insufficient to render the claims non-abstract. (Mot. at 14.) But in that case, the claims at issue were directed to the abstract idea of "generic index" for "organizing information stored in a database." *BSG*, 899 F.3d at 1283. And rather than provide an "improvement to the way databases store or organize information," under the claimed methods, the information inputted by users into is "stored and organized in the same manner as information inputted into conventional databases." *Id.* at 1289. After concluding that the claims were abstract, the court rejected the argument that "a claim is not directed to an abstract idea so long as it recites limitations that render it narrower than that abstract idea." *Id.* at 1287. In other words, narrowing limitations, *by themselves*, cannot save a claim that is inherently abstract. *Id.* Here, by contrast, the '825 patent claims are clearly directed to improving "conventional data compression techniques" using a new and unconventional combination of content independent data compression and content dependent data compression. ('825 Patent at 3:49–58.) Federal Circuit precedent

establishes that this is *not* an abstract idea, and Defendant's "minimal narrowing" argument is thus irrelevant.

The claims in *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322 (Fed. Cir. 2017) also were not directed to improvements in computer functionality, but rather recited methods for creating a composite image using standard encoding and decoding techniques. More specifically, the claimed invention was limited to taking an image on a display, assigning an image code, and reproducing the image based on the codes, which, as the court noted, "does not even require a computer." *Id.* at 1326, 1328. Here, by contrast, the '825 patent is not simply directed to encoding and decoding. Nor does it merely use conventional computing techniques to achieve an abstract result. Rather, the '825 patent discloses specific improvements to data compression by compressing the data stream using a combination of content dependent and independent data recognition, as well as a plethora of encoders to achieve maximum compression. ('825 Patent at 4:64–5:03; *see also* Ex. 1 at 10 (finding *RecogniCorp* inapposite because the related '728 patent "improves typical data compression").)

In *In re TLI Commc'ns LLC Patent Litigation*, 823 F.3d 607 (Fed. Cir. 2016), the patent claimed a method and system for taking, transmitting, and organizing digital images. The court found that the recited physical components "merely provide a generic environment in which to carry out the abstract idea of classifying

17

and storing digital images in an organized manner." *Id.* at 611. The court further noted that "the specification's emphasis that the present invention 'relates to a method for recording, communicating and administering [a] digital image' underscores that [the claim] is directed to an abstract concept." *Id.* Here, by contrast, the '825 patent specification makes clear that the patent is directed to improvements in digital data compression, which is not abstract. ('825 Patent at 1:44–51, 3:49–67, 4:64–5:03.) And multiple courts have rejected the notion that the claims only "provide a generic environment" for digital data. (*See, e.g.*, Ex. 1 at 12–13 (analyzing claims of the related '728 patent); Ex. 4.)

In *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014), the claims generally recited a method of extracting data from hard copy documents using a scanner, recognizing information from the extracted data, and storing that information in a memory. *Id.* at 1345. The court found that the claims were directed to the abstract concept of data collection, recognition, and storage, which is "undisputedly well-known." *Id.* at 1347. For example, "banks have, for some time, reviewed checks, recognized relevant data such as the amount, account number, and identity of account holder, and stored that information in their records." *Id.* Here, by contrast, the '825 patent claims are directed to new and improved methods for digital data compression, which cannot be performed by humans, and which the Federal Circuit has repeatedly recognized

as not abstract. *See, e.g.*, *DDR Holdings*, 773 F.3d at 1259.[7]

As explained above, and as has been found by multiple courts in denying § 101 motions regarding related patents, because the '825 patent claims are directed to specific improvements in computer functionality (namely, digital data compression), this case is more analogous to the cases such as *DDR Holdings*, *Finjan, Enfish, DDR*, *Core Wireless*, and *Visual Memory*.

For example, in *Visual Memory*, the Federal Circuit determined that the claims at issue were directed to an "improved memory system" that configured operational characteristics of a computer's cache memory based on the type of processor connected to the memory system. *Id.* at 1261. Depending on the processor type, the invention's memory caches could adjust their function, which allowed the claimed

---

[7] The other cases cited by Defendant are similarly inapposite. *FairWarning IP v. Iatric Sys., Inc.*, 839 F.3d 1089 (Fed. Cir. 2016) (patent relating to "detecting improper access of a patient's protected health information"); *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364 (Fed. Cir. 2017) (claims involving "acquiring identification data from a bankcard, using the data to verify the validity of the bankcard, and denying access to a transit system if the bankcard is invalid"); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016) (patent claiming method for "detecting events on an interconnected electric power grid in real time over a wide area and automatically analyzing the events on the interconnected electric power grid," which was merely directed to "gathering and analyzing information of a specified content, then displaying the results"); *Two-Way Media Ltd. v. Comcast Cable Comm., LLC*, 874 F.3d 1329 (Fed. Cir. 2017) (claims directed to abstract idea of "sending," "directing," and "monitoring" information); *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1339 (Fed. Cir. 2018) (claims directed to the implementation of an attention manager to acquire and display content); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332 (Fed. Cir. 2017) (disclosing invention allowing a user to "view and update XML documents in different formats"); *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016) (patents claiming systems for generating and transmitting menus, which were intended to address problems in restaurant ordering and were "not directed to a specific improvement in the way computers operate"); *Voit Techs., LLC v. Del-Ton, Inc.*, 757 F. App'x 1000 (Fed. Cir. 2019) (patent disclosing method that for providing secure communication of text and image information between a central server computer and remote client computers for the purpose of buying and selling items; in finding the claim abstract, the Federal Circuit noted that the claims did not "did not "improve[] compression techniques or the functioning of the computer").

invention to accommodate different types of processors without compromising performance. *Id.* at 1256–57, 1259. Though the patent in *Visual Memory* utilized conventional computer components, the specification made clear that "the inventors viewed their innovation as the creation of 'a memory system which is efficiently operable with different types of host processors,'" and the patent claims disclosed, in comparable detail to the '825 patent, how to implement such a memory system. *Id.* at 1261.[8]

### b. Defendant's arguments regarding the '751 and '458 patents are flawed.

Defendant's arguments regarding the '751 and '458 patents are essentially the same its arguments regarding the '825 patent and fail for the same reasons. Defendant asserts that these patents are directed to "compressing data based on its attributes and using compression to speed up data." Mot. at 22. But as discussed above, even this oversimplified characterization of the claims demonstrates that they are directed to particular methods and systems for digital data compression, which

---

[8] Claim 1 of the patent at issue in *Visual Memory* recited:

    A computer memory system connectable to a processor and having one or more programmable operational characteristics, said characteristics being defined through configuration by said computer based on the type of said processor, wherein said system is connectable to said processor by a bus, said system comprising:

        a main memory connected to said bus; and

        a cache connected to said bus;

        wherein a programmable operational characteristic of said system determines a type of data stored by said cache.

The '825 patent claims are at least as detailed as this claim.

the Federal Circuit has repeatedly recognized as eligible under § 101. *See, e.g.*, *DDR Holdings*, 773 F.3d at 1259.

Defendant's assertion that the "patents admit that there is no purported improvement in the compression techniques or in data storage technology" (Mot. at 24) is patently false and is directly contradicted by the faces of the patents themselves. The '458 patent expressly states that the invention relates to particular systems and methods for "improving data storage and retrieval bandwidth utilizing lossless data compression and decompression." ('458 Patent at 1:17–20.) The patent specification also identifies existing problems in the realm of digital data compression that the invention is intended to address, including that "high performance disk interface standards . . . offer only the promise of higher data transfer rates through intermediate data buffering in random access memory," "[f]aster disk access data rates are only achieved by the high cost solution of simultaneously accessing multiple disk drives with a technique known within the art as data striping," and "additional problems with bandwidth limitations similarly occur[ing] within the art by all other forms of sequential, pseudorandom, and random access mass storage devices." (*Id.* at 2:9–59.) The '458 patent solves the foregoing problems with novel technological solutions in digital data compression utilizing a plurality of different lossless dictionary compression encoders, and optionally a compression descriptor, for accelerated storage and retrieval of data blocks. The

novel approaches taught in the specification, include (a) using digital compression type descriptor "for output so as to indicate the type of compression format of the encoded data block"; (b) "data storage and retrieval accelerator method and system [being] employed in a disk storage adapter to reduce the time required to store and retrieve data from computer to a disk memory device"; (c) "data storage and retrieval accelerator method and system [being] employed in conjunction with random access memory to reduce the time required to store and retrieve data from random access memory"; and (d) "provid[ing] an effective increase of the data storage and retrieval bandwidth of a memory storage device." (*Id.* at 2:63–3:62; 11:63–12:58.)

Likewise, the '751 patent is aimed at providing accelerated transmission of data in a communication channel using data compression and decompression to provide data feeds, transfers, and communications and effectively increase the bandwidth of the communication channel and/or reduce the latency of data transmission. ('751 Patent at 1:25–36.) The patent discusses problems in the existing art with the high cost of implementing, disseminating, and operating trading systems due to the "high bandwidth required to transfer large quantities of data" and the "processing power required to store, transmit, route, and display the information." (*Id.* at 2:42–49.) The patent further notes that "[s]oftware solutions have high latency and cost while hardware solutions have even higher cost and complexity with somewhat lower latency." (*Id.* at 2:54–56; *see also id.* at 5:20–22 ("The limitation

of highly significant bandwidth and/or long delays with co-location processing and long latency times is solved by the present invention.").) The '751 patent solves these and other technological problems and limitations in the prior art by providing novel technological solutions in digital data transmission, which provide, among other things, transmission and transparent multiplication of digital-data communication bandwidth, as well as a potential reduction of the latency associated with data transmission of conventional systems, and also by utilizing a state machine to compress data blocks based on an analysis of the specific content of the data being encoded. (*Id.* at 5:13–29, 6:13–40.) "The effective increase in bandwidth and reduction of latency of the communication channel is achieved by virtue of the faster than real-time, real-time, near real-time, compression of a received data stream prior to transmission." (*Id.* at 6:28–40.) The claimed invention recognizes a characteristic, attribute, or parameter of data to select a compression encoder, and uses a state machine to provide compressed data. *Id.* Advantages of the claimed inventions include "a consistent reduction in latency" where "[t]he data compression ratio is substantial and repeatable on each data packet," and packet independence (i.e., "no packet-to-packet data dependency"). (*Id.* at 7:52–8:2.)

Contrary to Defendant's assertions, the fact that the patent claims utilize conventional computing elements and known compression *algorithms*, does not render them abstract. Where, as here, "the claims 'are directed to an improvement in

the functioning of a computer,'" namely improved compression *systems*, the patents'

"use of conventional computer components" is not fatal to patent eligibility. *Visual*

*Memory*, 867 F.3d at 1262; *see also Enfish*, 822 F.3d at 1338.

Defendant's assertion that the claims are abstract because they are "results-

oriented" likewise fails. For example, claim 1 of the '458 patent recites specific steps

for accelerating data storage requiring a memory device, analysis of the data blocks,

two encoders, and a processor configured to compress two data blocks with two

different lossless compression techniques based on the parameters of the data blocks.

The dependent claims contain additional limitations, including "analysis of the

second data block exclude[ing] analysis based solely on reading a descriptor" (claim

4), further configuring the one or more processors "to write a descriptor to the

memory device" where "the descriptor indicates the lossless compression technique

used to encode the second data block" (claim 6), further configuring the one or more

processors to "store a descriptor on the memory device indicative of the lossless

compression technique used to encode the second data block such that the descriptor

is capable of being utilized to decode at least a portion of the second encoded data

block" (claim 7), and including a "reference to the unencoded first data block" in the

first encoded data block (claim 8).

Claim 1 of the '751 patent recites specific steps for compressing data

including analyzing content of a data block to identify a parameter, attribute, or value

of the data block that excludes analyzing based solely on reading a descriptor; selecting an encoder associated with the identified parameter, attribute, or value; and compressing data in the data block with the selected encoder to produce a compressed data block, wherein the compressing includes utilizing a state machine; and storing the compressed data block. The dependent claims contain additional limitations, including, for example, "transmitting the compressed data block in a data packet to a client, the data packet including both control information and compressed data information" (claim 2), utilizing Transmission Control Protocol/Internet Protocol (TCP/IP) to transmit the compressed data block (claim 3), and "transmitting the compressed data block in a packetized data stream having data packets that include control information and compressed data information, and wherein the selected encoder is a packet independent encoder" (claim 11).

Notably, multiple courts have rejected similar arguments that related patents with specifications substantially identical to the '458 and '751 patents are abstract. For example, in *Realtime v. Carbonite*, the court found that the '530 and '908 patents—which are in the same family as and share a specification with the '458 patent—"as a whole show a non-abstract idea despite disclosing generic, conventional computing elements," and "improve a technological process." (Ex. 1 at 15.) The court further found that the claims "pair a data accelerator with a memory device, and then places a data stream with a proper technique that compresses the

data stream and puts the stream into storage more efficiently," which "goes beyond the abstract patents in *Re[cog]niCorp*, where the patent involved choosing one facial feature image and putting it on the composite image in a second area of the display by using multiplication operations." *Id.* Still further, the court expressly rejected the defendants' "results-oriented" argument, explaining: "Although the claims have stated they only result in "faster compression," that stated achievement alone does not make them abstract. . . . ***The patents set out specified rules to lead to this result and move them past an over-simplified result-oriented patent***." (*Id.* at 16.)

With respect to the '204 patent, which is related to and shares a specification with the '751 patent, the *Carbonite* court found that this patent "offers more than a generic use of data transmission; it provides specific steps of analyzing information and compressing data using specific encoders related to recognized parameters within the data" and is "not abstract." (*Id.* at 20.) The court further found that the '204 patent is a "method that analyzes stored data and selects an encoder based on the data, compresses the data, sends it through a machine, and transmits it," which is "more than a result-based patent and do not monopolize an abstract idea." (*Id.*)

Defendant fails to acknowledge, much less distinguish, any of these findings, because they are simply not distinguishable. The same analysis applies to the '458 and '751 patents and requires a finding that they too are not abstract.

**B.      Defendant Also Cannot Show That the Claims Lack Inventive Concept Under *Alice* Step 2.**

Because Defendant cannot meet their burden under step 1, the inquiry ends here and step 2 need not be addressed. But in any event, Defendant also cannot meet its burden under step 2.

**1.      The analysis under *Alice* step 2 involves questions of fact.**

*Alice* Step 2 requires examination of the claim elements "both individually and 'as an ordered combination.'" *Alice*, 134 S. Ct. at 2355. The Federal Circuit has clearly established that defendants cannot prevail on this step simply by showing that individual claim elements are "known in the art." *Bascom*, 827 F.3d at 1349–50. Indeed, "[t]he genius of invention is often a combination of known elements which in hindsight seems preordained." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1351 (Fed. Cir. 2001).

In *Berkheimer*, the Federal Circuit confirmed that any *Alice* step 2 analysis involves underlying factual questions. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368–69 (Fed. Cir. 2018). Specifically, the court found that "***[t]he question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact***." *Id.* The court further explained that "[w]hether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art, and that "[t]he mere fact that something is disclosed in a piece of prior art . . . does not

27

mean it was well-understood, routine, and conventional." *Id.* at 1369. After reviewing the intrinsic record in the case[9], the court concluded that "[t]he improvements in the specification, to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities." *Id.* Accordingly, the district court there committed legal error in granting summary judgment despite this factual dispute. *Id.*

In *Aatrix Software*, the Federal Circuit applied these principles to vacate a district court's § 101 ruling pursuant to a Rule 12 motion. Buttressing its precedent in *Berkheimer*, the court held that "patent eligibility can be determined at the Rule 12(b)(6) stage … ***only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law***." *Aatrix Software*, 882 F.3d at 1125. The Federal Circuit found that the district court erred in granting the motion to dismiss because plaintiff's "allegations at a minimum raise factual disputes underlying the § 101 analysis, such as whether the claim term 'data file' constitutes an inventive concept, alone or in combination with other elements." *Id.* at 1126.

The *Aatrix* court did not end its analysis there. In the first decision of its kind in the § 101 context, the court applied well-established Rule 12(b)(6) principles and

---

[9] The patent at issue in *Berkheimer* claimed methods for digitally processing and archiving files. The specification discussed problems with conventional digital asset management systems and explained how the claims increased efficiency in computer functionality by eliminating redundancies, improving system efficiency, reducing storage requirements. *Id.* at 1369.

also found that the district court abused its discretion when it denied leave to file an amended complaint. In remanding, the court then expressly allowed the amended complaint, holding that, "[v]iewed in favor of [plaintiff], as the district court must at the Rule 12(b)(6) stage, the complaint alleges that the claimed combination improves the functioning and operation of the computer itself. These allegations, if accepted as true, contradict the district court's conclusion that the claimed combination was conventional or routine." *Id.* at 1127–28; *id.* at 1126 ("[A]t that stage there certainly were allegations of fact that, if [plaintiff's] position were accepted, would preclude the dismissal.").

As discussed further below, the faces of the patents themselves demonstrate that that they are inventive as they directed to unconventional technological solutions to address known problems in conventional data compression systems. Moreover, Realtime's amended complaint contains detailed factual allegations demonstrating the inventiveness of each of the patents, as well as setting forth claim constructions which further underscore the eligibility of the patents. (D.I. 18 at ¶¶ 9–14, 16–27, 45–56, 72–83.) At minimum, these allegations—which must be accepted as true and contradict Defendant's assertions that the claims are conventional or routine—raise factual disputes precluding dismissal at the pleading stage. *See Aatrix*, 882 F.3d at 1126–28.

### 2. The intrinsic record confirms that the claimed inventions involve unconventional technological solutions under step 2.

The '825 patent addresses the prior art problems, including: "their content sensitive behavior...often referred to as data dependency"; "significant variations in the compression ratio obtained when using a single lossless data compression technique for data streams having different data content and data size"; "extremely large number of application programs, some of which do not possess published or documented file formats, data structures, or data type descriptors"; "rate at which new application programs are developed and the need to update file format data descriptions." ('825 Patent at 2:4–3:51.) To address these technological problems, the claims require an unconventional combination of elements, including, for example, (1) "wherein determining is not based solely on a descriptor that is indicative of the parameter or attribute of the data within the data block"; (2) "compressing, if the parameter or attribute of the data … is identified, the data block with at least one encoder associated with the parameter or attribute," and (3) "compressing, if the parameter or attribute … is not identified, the data block with at least one encoder associated with a non-identifiable parameter or attribute."

The '458 patent addresses problems in digital-data compression, including: "high performance disk interface standards … offer only the promise of higher data transfer rates through intermediate data buffering in random access memory"; "[f]aster disk access data rates are only achieved by the high cost solution of

simultaneously accessing multiple disk drives with a technique known within the art as data striping"; "problems with bandwidth limitations … by all other forms of sequential, pseudorandom, and random access mass storage devices." ('458 Patent at 2:24–59.) To address these, the claims require an unconventional combination of elements, including, for example, "a data accelerator" with two different compression techniques; (b) "a memory device"; (c) where the accelerator is configured to compress two data blocks; (d) including "a first data block with a first compression technique"; and (e) a "second data block with a second [and different] compression technique." (*Id.* 18:45-67.) The accelerator is unconventional, as it requires two different compression techniques and the structural capability of compressing and storing digital data faster than the digital data can be stored in uncompressed form.

The '751 patent addresses specific problems in the prior art, including: "latency induced by the act of encryption, compression, decryption, and decompression"; "substantial latency caused by aggregating data packets due to poor data compression efficiency and packet overhead"; capacity transmission limitations using existing T1 lines; "[t]he limitation of highly significant bandwidth and/or long delays with co-location processing and long latency times." ('751 Patent at 1:40–5:22.) The '751 patent solves these problems by an unconventional compression system to provide a multiplication of bandwidth and a reduction in transmission

latency. (*Id.* at 5:28–29, 6:13–19.) For example, claim 1 requires: (a) "identif[ying] a parameter, attribute, or value of the data block," (b) analysis "that excludes analyzing based solely on reading a descriptor," (c) "selecting an encoder associated with the identified parameter, attribute, or value"; (c) "compressing data … with the selected encoder … utilizing a state machine"; (d) "storing compressed data block"; and (e) wherein "the time of the compressing the data block and the storing the compressed data block is less than the time of storing the data block in uncompressed form."

The novel and unconventional nature of the asserted patents is further confirmed by the fact that patents in the same family with substantially identical specifications (e.g., the '728, '530, and '908 patents) have gone through the adversarial *inter partes* review process, after which all challenged claims were confirmed to be patentable. (Exs. 5–7.) Defendant's unsupported assertion that claims are not "inventive" is false and contradicted by the intrinsic record, which confirms that the claims recite unconventional solutions to improve computer capabilities. Defendant's assertions are also contradicted by multiple courts findings that related patents are inventive.[10] At the very least, Realtime's allegations in the

---

[10] *See, e.g.*, Ex. 1 at 11 ("Claim 1 of the '728 Patent is inventive because it utilizes a system and its structural elements in a way that is a solution to a computing problem."), *id.* at 17 ("[T]he '530 and '908 Patents create an unconventional solution that results in faster disk access and bandwidth limitations by using a memory device and a data accelerator to compresses the data stream using different compression techniques utilizing lossless data compression and decompression."); *id.* at 21 ("Claim 12 of the '204 Patent presents an inventive concept. The claim uses a specific method with various steps to provide faster transmission of data. . . . Although the claim may use some

complaint, the intrinsic record, and the prior court rulings raise factual issues which preclude dismissal.

In sum, the claimed inventions here do not merely recite well-understood, routine, conventional activities but, instead, are necessarily rooted in computer technology and provide a technological solution that improves computer functionality and overcome a problem specifically arising in the realm of compression of digital computer data. The patents amount to "significantly more" than simply claiming an abstract idea and are therefore patent-eligible.

### 3.   Defendant's conclusory arguments contravene Federal Circuit precedent and must be rejected.

In arguing that the claims lack inventive concept, Defendant pursues the same flawed arguments discussed above in connection with *Alice* step 1. For example, Defendant asserts that the patents lack inventive concept because individual claim elements purportedly recite "generic" components. But the fact that some of the individual claim limitations may be performed using known components does not render them ineligible. *Bascom*, 827 F.3d at 1350. Properly viewing the claims as a whole, it is clear that the patents present unique solutions to improve computer functionality. For example, the '825 patent provides a technological solution in digital-data compression by utilizing multiple encoders to compress data blocks

---

known technology, the system as a whole creates an unconventional solution because it utilizes 'data compression and decompression to provide data transfer . . . [and] reduce the latency of data transmission.'").

based on an analysis of the specific content or type of the data being encoded without relying solely on a descriptor. ('825 Patent at 2:26–3:67.) The '458 patent likewise solves known problems with novel technological solutions in digital data compression  by utilizing a plurality of different lossless dictionary compression encoders, and optionally a compression descriptor, for accelerated storage and retrieval of data blocks. ('458 Patent at 2:63–3:62; 11:63-12:58.) And the '751 patent provides novel technological solutions in digital data transmission, which provide, among other things, transmission and transparent multiplication of digital-data communication bandwidth, as well as a potential reduction of the latency associated with data transmission of conventional systems, and also by utilizing a state machine to compress data blocks based on an analysis of the specific content of the data being encoded. ('751 Patent at Id. at 5:13–29, 6:13–40.)

Defendant also repeats its assertions that the claims merely focus on results, and that there "there is no 'specific implementation' or 'specific improvement' in computer technology that might provide inventive concept." (Mot. at 20, 26.) But as discussed above, these baseless assertions are directly contradicted by the claim language which recites highly specific steps and components for achieving the desired results. And regardless, Defendant's assertions  amount to little more than attorney argument which cannot clearly and convincingly refute the intrinsic evidence supporting patentability. The Court "must take the specification's

statements about the purported invention to be true," and is "not free to accept [defendant's] contrary attorney argument" that the claims are directed to conventional means. *MAZ Encryption Techs. LLC v. Blackberry Corp.*, No. CV 13-304-LPS, 2016 WL 5661981, at *5 (D. Del. Sept. 29, 2016); *see also Bascom*, 827 F.3d at 1352 (patents and facts are "construed in favor of [the patentee]"). At the very least, factual issues compel denial of the motion.[11]

### 4. Defendant has not clearly and convincingly shown that *all* of the claims are ineligible

Defendant's motion should be denied also because it provides no clear and convincing evidence that *all* of the claims of the asserted patents (totaling 100 claims across three different, unrelated patents) are ineligible. Defendant merely recites some of the limitations of the dependent claims and provides conclusory attorney argument that they "recite only insignificant limitations" and "likewise add no inventive concept." (Mot. at 21, 26.) This is improper. "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art." *Bascom*, 827 F.3d at 1350. And regardless, Defendant's attorney argument is insufficient to establish that the claims are directed to unconventional means. *MAZ Encryption*, 2016 WL 5661981, at *5. Defendant has not shown and cannot show that all 100 patent claims are ineligible under any standard, let alone

---

[11] Should the Court be inclined to grant dismissal, Realtime respectfully requests that dismissal be without prejudice to amending the complaint because "there certainly [are] allegations of fact that, if … accepted, would preclude the dismissal." *Aatrix*, 882 F.3d at 1126.

the heightened standard on a motion to dismiss.[12]

The cases cited by Defendant (e.g., *BSG*, *Content Extraction*, *RecogniCorp*, and *Two-Way Media*) are inapposite for the reasons discussed above. Whereas the patents in each of Defendant's cited cases are more generally directed to collecting and organizing data and do not improve computer functionality, it is clear here that the asserted patents claim unconventional solutions to problems in the realm of digital data compression.

### C.   As Set Forth in Realtime's Complaint, Proper Construction of the Claims Confirms that the Claims Are Patent Eligible Under § 101

Realtime's amended complaint offers the following fact-based claim constructions that confirm that the solutions claimed in the asserted patents do not just cover any form of digital data compression techniques, but instead are more focused—and covers a technical sub-species of digital data compression:

- **"compressing" / "compressed" / "compression": [representing / represented / representation of] data with fewer bits**
- **"descriptor": recognizable digital data**
- **"data stream": one or more data blocks transmitted in sequence**
- **"data block": a single unit of data, which may range in size from individual bits through complete files or collection of multiple files**
- **"analyze": directly examine**

---

[12] The claims unaddressed by Defendant provide numerous other limitations and combinations, including, for example, "data descriptors," "disk interface," "dictionary compression," "serial configuration," "real-time," "TCP/IP," "UDP Packets," "packetized data stream," "lossless" encoders, "synchronization point," "default data compression," and numerous other limitations arranged and combined in specific claimed ways. (*See* '825, '751, and '458 claims.)

(D.I. 18 ¶ 9.)

Prior constructions in earlier cases involving patents related to the '458, '751 and '825 patents further confirm that the claimed methods and systems are in fact limited to the compression of digital data. For example, pursuant to a stipulation, a Texas court construed the term "compress"—a term used in all patents—to mean "represent data with fewer bits." (*Realtime Data LLC v. Actian Corp.*, No. 15-cv-463-RWS-JDL, D.I. 362 (E.D. Tex. July 28, 2016).) This construction confirms that the claimed inventions are limited to the realm of digital-data compression, as a "bit" is a unit of digital data. The constructions of other claim terms, such as "data block" and "accelerator" also confirm that the patented inventions are unique to the compression of digital data. For example, the plain and ordinary meaning of the term "data block" was stipulated to be "a single unit of data," which may only "range in size from individual bits through complete files or collection of multiple files." *Id.*

At least one court has specifically ruled that if Realtime's "construction of the claims at issue prevails, the patents are more analogous to those in *DDR Holdings* because they provide technological solutions to problems arising specifically in the realm of computer technology," and, therefore, any "argument that the patents are directed to an abstract idea would fail." (Ex. 3 at 2.) The same conclusion is equally appropriate here. Under the foregoing constructions, which must be accepted as true on a motion to dismiss, it is clear that that asserted patents are eligible under § 101.

At minimum, they present fact issues that preclude dismissal at the pleading stage.

## V.      CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss should be denied.

September 16, 2019                    BAYARD, P.A.

OF COUNSEL:                           /s/ Stephen B. Brauerman
                                      Stephen B. Brauerman (No. 4952)
Marc A. Fenster                       600 N. King Street, Suite 400
Brian D. Ledahl                       Wilmington, DE 19801
Reza Mirzaie                          (302) 655-5000
Paul A. Kroeger                       sbrauerman@bayardlaw.com
C. Jay Chung
RUSS, AUGUST & KABAT                  *Attorneys for Plaintiff Realtime Data*
12424 Wilshire Boulevard, 12th Floor  *LLC*
(310) 826-7474
Los Angeles, CA 90025-1031
mfenster@raklaw.com
bledahl@raklaw.com
rmirzaie@raklaw.com
pkroeger@raklaw.com
jchung@raklaw.com

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATIONS

Pursuant to paragraph 19(c) of the Court's Form Scheduling Order for Patent Cases in Which Infringement Is Alleged, the undersigned certifies that this brief was prepared using Times New Roman, 14-point font, and contains 9,436 words, excluding the caption, tables, and signature block.

/s/ Stephen B. Brauerman