# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **REALTIME DATA, LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **CASE NO. 6:17-cv-00121** |
| | § | |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **CARBONITE, INC., ET AL.** | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

Before the Court is Defendant Carbonite, Inc.'s Motion to Dismiss for Failure to State a Claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. No. 27.)  Plaintiff Realtime Data, LLC has filed a Response (Doc. No. 37), to which Carbonite filed a Reply (Doc. No. 49) and Realtime has filed a Sur-Reply.  (Doc. No. 59.)

Upon consideration, the Court **RECOMMENDS** the Motion (Doc. No. 27) be **DENIED.**

## BACKGROUND

On February 27, 2017, Realtime filed the above-captioned action alleging infringement of U.S. Patent No. 9,054,728 (the '728 Patent); U.S. Patent No. 7,415,530 (the '530 Patent); U.S. Patent No. 9,116,908 (the '908 Patent); and U.S. Patent No. 8,717,204 (the '204 Patent).  (Doc. No. 1.)   In its Complaint, Realtime specifically alleges infringement of Claim 1 of the '728 Patent, Claim 1 of the '530 Patent, Claim 1 of the '908 Patent, and Claim 12 of the '204 Patent. *See id.*  On May 9, 2017, Carbonite filed the instant motion to dismiss Realtime's complaint for

failure to state a claim on the grounds that all of the claims of the Asserted Patents are ineligible

for patentability under 35 U.S.C. § 101. (Doc. No. 27.)

The '728 Patent is entitled "Data compression systems and methods" and relates to "data

compression and decompression and, more particularly, to systems and methods for data

compression using content independent and content dependent data compression and

decompression." '728 Patent at 1:34–38. Claim 1 of the '728 Patent recites:

> 1.    A system for compressing data comprising;
>        a processor;
>        one or more content dependent data compression encoders; and
>        a single data compression encoder;
>        wherein the processor is configured:
>
>> to analyze data within a data block to identify one or more parameters or attributes of the data wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block;
>>
>> to perform content dependent data compression with the one or more content dependent data compression encoders if the one or more parameters or attributes of the data are identified; and
>>
>> to perform data compression with the single data compression encoder, if the one or more parameters or attributes of the data are not identified.

The '530 and '908 Patents are both entitled "System and Methods for Accelerated Data

Storage and Retrieval" and relate "generally to data storage and retrieval and, more particularly

to systems and methods for improving data storage and retrieval bandwidth utilizing lossless data

compression and decompression." '530 Patent at 1:15–18; '908 Patent at 1:15–18. Claim 1 of

the '530 Patent recites:

> 1.    A system comprising:
>        a memory device; and
>        a data accelerator, wherein said data accelerator is coupled to said memory
>>        device, a data stream is received by said data accelerator in

received form, said data stream includes a first data block and a second data block, said data stream is compressed by said data accelerator to provide a compressed data stream by compressing said first data block with a first compression technique and said second data block with a second compression technique, said first and second compression techniques are different, said compressed data stream is stored on said memory device, said compression and storage occurs faster than said data stream is able to be stored on said memory device in said received form, a first data descriptor is stored on said memory device indicative of said first compression technique, and said first descriptor is utilized to decompress the portion of said compressed data stream associated with said first data block.

Claim 1 of the '908 Patent recites:

1.  A system comprising:
    a memory device; and
    a data accelerator configured to compress: (i) a first data block with a first compression technique to provide a first compressed data block; and (ii) a second data block with a second compression technique, different from the first compression technique, to provide a second compressed data block;
    wherein the compressed first and second data blocks are stored on the memory device, and the compression and storage occurs faster than the first and second data blocks are able to be stored on the memory device in uncompressed form.

The '204 Patent is entitled "Methods for Encoding and Decoding Data" and relates "generally to systems and method for providing data transmission, and in particular, to systems and method for providing accelerated transmission of data . . . over a communication channel using data compression and decompression." In turn, this accelerated data transmission can "provide data broadcast feeds, bi-directional data transfers, and all other forms of communication with or without security and effectively increase the bandwidth of the communication channel and/or reduce the latency of data transmission." '204 Patent at 1:25–35. Claim 12 of the '204 Patent recites:

12.  A method for processing data, the data residing in data fields, comprising:
    recognizing any characteristic, attribute, or parameter of the data;

3

selecting an encoder associated with the recognized characteristic, attribute, or parameter of the data;

compressing the data with the selected encoder utilizing at least one state machine to provide compressed data having a compression ratio of over 4:1; and

point-to-point transmitting the compressed data to a client;

wherein the compressing and the transmitting occur over a period of time which is less than a time to transmit the data in an uncompressed form.

## **LEGAL STANDARD**

### I.  **Motion to Dismiss**

In order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must allege "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face'" to show that the plaintiff is plausibly entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

When patent claims on their face are plainly directed to an abstract idea, it is proper to make a determination of patent validity under § 101 at the pleading stage, and such conduct has been repeatedly sanctioned by the Federal Circuit. *See, e.g., Coffelt v. NVIDIA Corp.*, 680 Fed. App'x. 1010, 1011 (Fed. Cir. 2017); *Evolutionary Intelligence LLC v. Sprint Nextel Corp.*, 677 F. App'x 679, 680 (Fed. Cir. 2017); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1092 (Fed. Cir. 2016); *Internet Patents Corp. v. Active Network, Inc. et al.*, 790 F.3d 1343, 1345 (Fed. Cir. 2015); *OIP Tech. Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015). However, in some circumstances, the legal analysis required for determining patent validity

4

under § 101 "may contain underlying factual issues," that would render such a ruling premature. *Mortg. Grader, Inc. v. First Choice Loan Servs.*, 811 F.3d 1314, 1325 (Fed. Cir. 2016) (citing *Accenture Global Servs. v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013)).

## II.    Patent-Eligible Subject Matter

A patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  "Congress took this permissive approach to patent eligibility to ensure that ingenuity should receive liberal encouragement." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (internal quotations omitted).  The Supreme Court has long recognized three specific exceptions to § 101's broad patentability principles: laws of nature, physical phenomena, and abstract ideas. *Id.*; *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66, 89 (2012); *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116. 186 L. Ed. 2d 124 (2013).

The Supreme Court has set forth a two part test for patent eligibility.  *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354, 189 L. Ed. 296 (2014).  First, the court must determine "whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Id.* at 2355.  The "'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" *Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327, 1335 (Fed. Cir. 2016) (quoting *Internet Patents Corp.*, 790 F.3d at 1346).  While there is no conclusive rule for determining what is an abstract idea, both the Federal Circuit "and the Supreme Court have found it sufficient to compare claims at issue to those already found to be directed to an abstract idea in previous cases." *Id.* at 1334.  Where "the focus of the claims is on the specific asserted improvement in

computer capabilities" and not "a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool," the claims are directed to patent-eligible subject matter.  *Id.* at 1336.

If the court concludes that the claims are directed to an abstract idea in Step 1, the court must then "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application."  *Id.* (quoting *Mayo*, 566 U.S. at 79).  The Court has described this second step as a search for an "inventive concept"—"an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'"  *Id.* (quoting *Mayo*, 566 U.S. at 73).  An inventive concept transforming a claim to patent-eligible may result from the "non-conventional and non-generic arrangement of known conventional pieces."  *BASCOM Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).  Additionally, an inventive concept may result from the specific implementation of an abstract idea limited to a technological solution.  *Id.* at 1350–1352.

## DISCUSSION

Carbonite contends that Realtime's claims do not survive under *Alice*.  (Doc. No. 27 at 17–24.)  Carbonite argues at step one that all of the claims of the Asserted Patents are directed towards the abstract idea of data encoding/compressing and decoding/decompressing and thus are patent-ineligible subject matter.  *Id.* at 11.  Carbonite argues at Step 2 that the processor and encoders are not inventive concepts capable of transforming the claims to patent-eligible subject matter because a processor is a generic computer component and the claimed elements relating to the encoders are uninventive.  *Id.* at 23.  Alternatively, Carbonite argues that the additional

independent and dependent claims do not add a non-abstract or inventive concept under Step 2. *Id*. at 24.

Realtime asserts at Step 1 that the claims are not directed to abstract subject matter, but rather are rooted in computer technology and solve problems specific to data compression. (Doc. No. 37 at 13–14.) At Step 2, Realtime contends that the limitations in the subject claims present an inventive concept. *Id*. at 25. Furthermore, while the claims recite generic computer components, such as a processor, Realtime argues that the components' inventive functions present an inventive concept thereby transforming the claims to patent-eligible. *Id*. at 29.

### A. Patent Eligibility of the Asserted Claim of the '728 Patent

Under Step 1, the court must decide if the patent in question is an improvement on the functionality of a computer or if the patent is an abstract idea for which the computer is only used as a "tool." *Enfish*, 822 F.3d at 1335–36; *see Opal Run, LLC v. C&A Marketing Inc.*, No. 2:16-cv-0024, 2017 WL 2990298, at \*2 (E.D. Tex. Mar. 14, 2017). In making this determination, the court looks at what the claims cover. *Ultramercial, Inc. v. Hulu, LLC*, 772 F. 3d 709, 714 (Fed. Cir. 2014). Neither the Supreme Court nor the Federal Circuit has articulated a "single, succinct, usable definition or test." *Amdocs (Israel) Ltd. V. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016). Courts utilize an analytical approach to examine prior cases where the claims are similar. *Id.* at 1288.

The '728 Patent is directed to patent eligible subject matter because it discloses a specific improvement in computer capabilities: a system for an improved data compression technique. '728 Patent at 2:07–50 (detailing the problems in data compression when based on dependent variables). The patent notes issues in lossless compression techniques because of "content sensitive behavior" (or "data dependency") because there are "high data redundancies," as well

as "significant variation in the compression ratio" due to data streams having different data contents and different sizes (or "natural variation"). *Id.* at 2:29–45. Further, there are issues when "certain data compression techniques act upon many types of highly compressed data. Highly compressed data appears random and many data compression techniques will substantially expand, not compress this type of data." *Id.* at 2:47–50. The patent improves these issues by "applying a plurality of compression techniques on an input data stream so as to achieve maximum compression in accordance with the real-time or pseudo real-time data rate constraints." *Id.* at 5:02–05.

Specifically, claim 1 discloses a system comprising the tangible elements of a processor, one or more content dependent data compression encoders, and a single data compression encoder. *Id.* at 26:29–48. The processor is configured to analyze the data identifying one or more parameters or attributes of the data. *Id.* However, the analyzing step cannot be based solely on a descriptor that is indicative of the one or more parameters or attributes of the data. *Id.* The processor then performs content dependent data compression if one or more parameters or attributes of the data are identified. *Id.* Finally, the processor performs data compression with the single date compression encoder if one or more parameters or attributes are not identified:



8

The claim addresses improvements to conventional data compression through these structural elements and their ordered combination. The processor analyzes the data block of an input stream to identify a data type of a plurality of disparate data types, performs content dependent data compression on the data block if the data block is identified, and performs content independent data compression on the data block if it is not identified. *Id.* at 3:65–4:04. This, along with the plurality of encoders, allows for "maximum compression in accordance with the real-time or pseudo real-time data rate constraint." *Id.* at 5:03–05.

Carbonite argues that elements of claim 1, such as the processor and the encoders, are well-known, generic components (Doc. No. 27 at 16.) Carbonite also relies on the prior *Markman* hearing to argue the claim constructions show proof the terms are abstract. *Id.* Although words within a claim may disclose generic, conventional computing elements, a claimed system as a whole may present a non-abstract idea. *See Enfish*, 822 F.3d at 1335. A claim presents a non-abstract idea if it specifically implements a solution to a computing problem. *Id.* at 1338–39. As noted above, claim 1 is directed to non-abstract improvements to computerized data compression techniques found in the prior art. '728 Patent at 5:01–07; *see Opal Run*, 2017 WL 2990298, at *3 (finding a patent was not abstract because its claim included limitations that applied directly to a data template and recited improvements on the template itself). It "address[es] limitations in conventional data compression techniques" by "providing fast and efficient data compression using a combination of content independent data compression and content dependent data compression." '728 Patent at 3:53–64. This compression is achieved through using a plurality of encoders and compression techniques and chooses a compression technique based on the data type. *Id.* at 3:65–4:04.

Carbonite cites to *RecogniCorp, LLC v. Nintendo Co., Ltd.* to argue that claim 1 shows nothing more than unpatentable encoding and decoding. 855 F.3d 1322, 1326 (Fed. Cir. 2017). However, *RecogniCorp* involved a patent that was limited to taking an image on a display, assigning an image code using a mathematical formula, and reproducing the image based on the codes. *Id.* Because the claim reflected mere encoding and decoding, it was found to be "an abstract concept long utilized to transmit information." *Id.* In this case, claim 1 of the '728 Patent is not simply encoding and decoding. It improves typical data compression by compressing the data stream through content dependent and independent data recognition, as well as a plethora of encoders to achieve its maximum compression. '728 Patent at 5:03–07. This results in real-time or pseudo-real-time compression. *Id.*

Even if claim 1 of the '728 Patent is directed to an abstract idea, the claim, read as a whole, covers an "inventive concept." *Bascom*, 827 F. 3d at 1350. As stated above, the second step in determining patent eligibility under § 101 requires the court to consider the elements of the claim both individually and in an ordered combination to determine if they "transform the nature of the claim" into a patent-eligible application. *Alice*, 134 S. Ct. at 2354.

Carbonite's argument largely relies on the fact that Realtime uses generic elements and known techniques. Carbonite states that the claim has no "specific technical solution" and only has a "processor" and an "encoder," making it "insufficient to add an inventive concept to an otherwise abstract idea." (Doc. No. 27 at 22–23.) Realtime points out that the claim 1 of the '728 Patent uses an "entirely unconventional combination of structural elements." (Doc. No. 37 at 26.) Realtime argues that "the fact that some of the individual claim limitations may be performed using known devices or technology does not render them ineligible." *Id.* at 28. Claim 1 "must be specifically configured to perform the received, non-conventional functions,

10

including analyzing the data within the data block to identify one or more parameters or attributes and performing compression with a plurality of different encoders based on that analysis." *Id.* at 27.

A patent covers an inventive concept if it improves an existing technological process. *Bascom*, 827 F. 3d at 1351; *see also Trading Techs. Int'l, Inc. v. CGQ, Inc. et al.*, No. 2016-1616, 2017 WL 192716, at *3 (Fed. Cir. Jan. 18, 2017). The Court looks at "the limitations of the claims, taken individually" and sees if they are generic both independent and in an ordered combination to see if they are patent-eligible. *Bascom*, 827 F. 3d at 1349. Claims are not inventive if they "simply recite 'well-understood, routine, conventional activit[ies].'" *Id.* (quoting *Alice*, 134 S. Ct. at 2359).

Claim 1 of the '728 Patent is inventive because it utilizes a system and its structural elements in a way that is a solution to a computing problem. Carbonite relies on specific words of the patent in the abstract, but the system as a whole gives an ordered combination showing the different methods the data stream goes through before it compresses. '728 Patent at 9:22–24 ("[B]y processing the input data blocks with a plurality of encoding techniques and comparing the compression results, content free data compression is advantageously achieved."). Although it uses some generic and known elements, the patent takes those elements and uses them to overcome an existing technological problem. '728 Patent at 3:59–4:67 (detailing the inventions and the steps performed to result in faster compression); *see Bascom*, 827 F. 3d at 1351. The system creates an unconventional solution by configuring the data through analyzing and identifying the parameters or attributes of the data:

> In one aspect of the invention, a method for compressing data comprises the steps of: analyzing a data block of an input data stream to identify a data type of the data block, the input data stream comprising a plurality of disparate data types; performing content dependent data compression on the data block, if the data type

11

of the data block is identified; performing content independent data compression on the data block, if the data type of the data block is not identified.

'728 Patent at 3:65–4:04. The system looks through a "plurality" of data types, and chooses content dependent or content independent data compression based on the data block identification. *Id.* The ordered combination of analyzing and compressing results in an inventive concept for data compression.

Carbonite argues that the non-identified independent and dependent claims are analogous to claim 1 of the '728 Patent because they deal with limitations identified in the patent. (Doc. No. 27 at 24.) Carbonite further alleges that the independent and dependent claims do not form an inventive concept. *Id.* at 24–27. For the same reasons stated above, the Court similarly finds those claims directed to patent-eligible matter that provide an inventive concept.

Carbonite also states that the dependent claims are ineligible because they describe a function or outcome without any specificity and are therefore abstract. *Id.* at 25–27. Realtime asserts that there has been no showing besides conclusory arguments that the claims merely describe results claim results and are therefore conventional. (Doc. No. 37 at 30.) Patents should do more than "provide a generic environment in which to carry out the abstract idea of classifying and storing digital images in an organized manner." *In re TLI Comm. Patent Litigation*, 823 F.3d 607, 611 (Fed. Cir. 2016). However, "Courts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claim." *McRO, Inc. v. Bandai Namco Games America, Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (quoting *TLI Comm.*, 823 F.3d at 611). The claims in the '728 Patent discuss storing data, compressing data, and transmitting data. '728 Patent 3:59–5:12. Although the claims may deal with one specific issue in the compressing and storing of data, the Court

does not see any evidence that these claims only "provide a generic environment" for digital data. *TLI Comm.*, 823 F.3d at 611. The Court therefore finds these claims are not abstract.

For the reasons stated herein, the Court finds that claims 1–25 of the '728 Patent are directed to patent eligible subject matter and therefore **RECOMMENDS** that Carbonite's Motion (Doc. No. 27) be **DENIED** as to the asserted claims of the '728 Patent.

## B. Patent Eligibility of the Asserted Claims of the '530 Patent and '908 Patent

Carbonite contends that Realtime's patents are "directed to the abstract idea of encoding and/or decoding data." (Doc. No. 27 at 11.) Carbonite highlights that claim 1 of the '530 Patent and claim 1 of the '908 Patent "focus on 'a data accelerator' that uses two 'different' compression techniques without claim language directed to content-dependent or content-independent compression." *Id.* at 18. Carbonite points to claim 1 of the '530 Patent to state the term requires no construction and only has a "descriptor," which "does not meaningfully change the nature of the claim's focus on conventional data compression." *Id.*

Realtime argues that claim 1 of the '530 Patent and claim 1 of '908 Patent "solved problems in the conventional digital data compression arts by providing systems and methods utilizing a plurality of encoders and a compression descriptor. (Doc. No. 37 at 14.) Realtime contends that these claims are "systems and methods of digital data compression utilizing a plurality of encoders and a compression descriptor for accelerated storage and retrieval of data blocks[.]" *Id.* at 18–19. Realtime maintains that the digital-data may be well known, but claim 1 of the '530 Patent is not abstract because it uses "*at least two*[] different hardware or software digital-data compression encoders." *Id.* at 21.

Claim 1 of the '530 Patent and claim 1 of the '908 Patent both are not abstract because they utilize a system that improves computerized data compression through data storage and

retrieval and bandwidth "utilizing lossless data compression and decompression." '530 Patent at 1:15–19; '908 Patent at 1:15–18. The patents note issues with prior art because the high performance disk interface standards "offer only the promise of higher data transfer rates through intermediate data buffering in random access memory." '530 Patent at 2:34–38; '908 Patent at 2:34–38. Further, there are issues with faster disk access data rates because faster rates are only achieved by the high cost technique of data striping, *i.e.*, "simultaneously accessing multiple disk drives." '530 Patent at 2:42–45; '908 Patent at 2:42–45. The patents address these issues by utilizing lossless data compression and decompression, or compression that that is "identical to the original unencoded/uncompressed data." '530 Patent at 2:05–63; '908 Patent at 2:05–63 (describing lossless data compression and detailing issues with current art). The claims use the lossless data compression and decompression by pairing the compression techniques with a specific data block that improves storage retrieval and bandwidth. '530 Patent at 4:38–44; '908 Patent at 4:38–44.

Specifically, these claims disclose a system comprising a memory device and a data accelerator. '530 Patent at 18:23–42; '908 Patent at 18:50–63. The data accelerator is coupled to the memory device, and a data stream is received by the accelerator including a first and second data block. *Id.* The data stream is compressed by the accelerator to provide a compressed data stream using a first and second compression technique for the data blocks. *Id.* The compressed data is stored on the memory device and the compression and storage occurs faster than the data stream is able to be stored on the memory device in its received form. *Id.* A first data descriptor is stored on the memory device indicative of the first compression technique and the first descriptor is utilized to decompress the portion of the compressed data stream associated with the first data block:

14



These claims address improvements to data acceleration using specific elements and their ordered combination. *Id.* The data blocks are paired with specific compression techniques to achieve an increase in data storage and retrieval bandwidth in a memory device. *Id.*

Similar to the '728 Patent, these claims as a whole show a non-abstract idea despite disclosing generic, conventional computing elements. *See Enfish*, 822 F.3d at 1335. The claims pair a data accelerator with a memory device, and then places a data stream with a proper technique that compresses the data stream and puts the stream into storage more efficiently. '530 Patent at 2:58–3:58; '908 Patent at 2:58–3:58. Again, this goes beyond the abstract patents in *RegniCorp*, where the patent involved choosing one facial feature image and putting it on the composite image in a second area of the display by using multiplication operations. 855 F.3d at 1324. Here, the patents improve a technological process by pairing data blocks with specific techniques to achieve "an effective increase of [] data storage and retrieval bandwidth of a memory storage device." '530 Patent at 2:61–62; '908 Patent at 2:61–62.

Carbonite maintains that the claims of the '530 Patent and '908 Patent merely recite a faster storage rate and lack meaningful support for how the results should be achieved. (Doc.

15

No. 27 at 21–22.)  Carbonite states the elements do not convey how the results are achieved and concludes that "the functional limits in the claims of the Asserted Patents do not change the conclusion that they are drawn to an abstract idea."  *Id.* at 22.  Realtime asserts that the claims themselves are technological solutions to a technological problem, and the "*additional* limitations—e.g., 'occurs faster than,' 'compression ratio,' or 'less' time—does not transform an eligible claim to one that is ineligible."  (Doc. No. 37 at 22.)  Realtime points out that "claim 1 of the '530 specifically requires a data accelerator that is coupled to a memory device, where the data accelerator compresses data using two different compression techniques and a data descriptor used."  *Id.*

A court should not oversimplify a claim.  *McRO*, 837 F.3d at 1313.  The patents here use the elements of a data accelerator and memory device to compress different data blocks with specific data compression techniques.  '530 Patent at 2:58–3:58; '908 Patent at 2:58–3:58.  The patents are similar to *McRO* where the court found the combination of limitations were directed towards a specific invention that did not monopolize an abstract idea.  837 F.3d at 1313.  The claims of the '530 Patent and the '908 Patent apply specific elements to increase data storage. '530 Patent at 2:58–3:58; '908 Patent at 2:58–3:58.  Although the claims have stated they only result in "faster compression," that stated achievement alone does not make them abstract.  *See* '530 Patent; '908 Patent.  The patents set out specified rules to lead to this result and move them past an over-simplified result-oriented patent.  '530 Patent at 2:58–3:58; '908 Patent at 2:58– 3:58.  Therefore, the patents are not abstract.

Even if the claims were abstract, they produce an inventive concept.  Carbonite argues that the "memory device" is a tangible element and Realtime only uses well known techniques within the art.  (Doc. No. 27 at 23.)  Realtime argues the methods are far from "routine" because

16

they use "two different compression technique" and "the structural capability of compressing and storing a stream of digital data faster than the digital data can be stored in uncompressed form." (Doc. No. 37 at 27.)

Despite some of the well-known elements and techniques, the '530 and '908 Patents create an unconventional solution that results in faster disk access and bandwidth limitations by using a memory device and a data accelerator to compresses the data stream using different compression techniques utilizing lossless data compression and decompression. '530 Patent at 2:63–3:12; '908 Patent at 2:63–3:12. Current art is limited because of its "sequential, pseudo-random, and random access mass storage devices." '530 Patent at 2:46–48; '908 Patent at 2:46–48. Here, the claims use an unconventional solution because they use improvements in processing "coupled with advanced data compression and decompression algorithms [] enabling [] ultra high bandwidth data compression and decompression methods that enable improved data storage and retrieval bandwidth." '530 Patent at 3:50–54; '908 Patent at 3:50–54. The claims create a specific combination of compressing a data stream that results in an inventive concept for data compression.

Carbonite argues that the non-identified independent and dependent claims are analogous to claim 1 of the '530 Patent and claim 1 of the '908 Patent because they deal with limitations identified in the patent and they are result-based claims. (Doc. No. 27 at 24.) Carbonite further alleges that the independent and dependent claims do not form an inventive concept. *Id.* at 24–27. The patents here deal with a specific data compression system and method addressing the limitations of conventional data compression techniques. The Court similarly finds the claims are directed to patent-eligible subject matter that provide an inventive concept.

For the reasons stated herein, the Court finds that claims 1–17 and 19–26 of the '530 Patent and claims 1–30 of the '908 Patent are directed to patent eligible subject matter and therefore **RECOMMENDS** that Carbonite's Motion (Doc. No. 27) be **DENIED** as to the asserted claims of the '728 Patent.

### C. Patent Eligibility of the Asserted Claims of the '204 Patent

Carbonite notes that the '204 Patent has not gone through claim construction, but argues that claim 12 of the '204 Patent is similar enough to the above-listed patents that no construction was necessary to show that it is ineligible because it is generic and conventional. *Id.* at 15–17. Carbonite states that the '204 Patent is a mere transmission of data. *Id.* at 26. Carbonite maintains that this is like all of the other asserted patents and merely manipulates information and does not solve a specific problem, making the claim abstract. *Id.* at 20.

Realtime argues that the '204 Patent solves "problems in the conventional digital-data compression by utilizing a state machine to compress data blocks based on an analysis of the specific content or type of content being encoded." (Doc. No. 37 at 12.) Realtime points to claim 12 of the '204 Patent as directed to a distinct technological solution where "systems and methods of digital data compression utilizing a state machine to compress data blocks based on an analysis of the specific content or type of the data being encoded." *Id.* at 19.

The '204 Patent is aimed at providing accelerated transmission of data in a communication channel using data compression and decompression to provide data feeds, transfers, and communications and effectively increase the bandwidth of the communication channel and/or reduce the latency of data transmission. '204 Patent at 1:26–37. The patent notes issues with high cost of implementing, disseminating, and operating trading systems due to high bandwidth and the "processing power required to store, transmit, route, and display the

information[.]"  *Id.* at 2:46–53.  The patent further notes that "[s]oftware solutions have high latency and cost while hardware solutions have even higher cost and complexity with somewhat lower latency."  *Id.* at 2:58–60.  The claim addresses such issues by "providing accelerated transmission of broadcast data . . . over a communication channel using data compression and decompression to provide secure transmission and transparent multiplication of communication bandwidth, as well as reduce the latency associated with data transmission[.]"  *Id.* at 6:13–19.

Claim 12 specifically discloses a method for processing data, the data residing in data fields.  *Id.* at 23:55–56.  The method recognizes any characteristic, attribute, or parameter of the data.  *Id.* at 23:57–58.  It then selects an encoder associated with the recognized characteristic, attribute, or parameter of the data.  *Id.* at 23:59–60.  Then, the data is compressed with the selected encoder utilizing at least one state machine to provide compressed data having a compression ratio of over 4:1.  *Id.* at 23:61–63.  There is then point-to-point transmitting the compressed data to the client, wherein the compressing and transmitting occur over a period of time that is less than a time to transmit the data in an uncompressed form.  *Id.* at 23:61–67.  This provides compressed data with a compression ratio over 4:1 and transmits it point to point to a client:



19

Therefore, the '204 Patent offers more than a generic use of data transmission; it provides specific steps of analyzing information and compressing data using specific encoders related to recognized parameters within the data. *See* '204 Patent at 23:55–67. It acts differently than other data transmission systems within the art through its analysis, and is therefore not abstract. '204 Patent at 5:13–46; *see Personalized Media Comm. LLC v. Samsung Electronics America, Inc.*, No. 2:15-cv-1754, slip op., at 18–20 (E.D. Tex. Sept. 21, 2017) (finding a patent was not abstract because the command acted differently than other pseudo commands and meter commands).

Carbonite also argues that the '204 Patent recites a solution to a problem but does not provide a means of achieving the solution. (Doc. No. 27 at 21.) Carbonite states that the asserted claim "recites that data compression at a ratio of 4:1+ and transmission occurs in 'less than a time' it would take to transmit the data in an uncompressed form," and this result is "untethered to any 'inventive means of achieving the result.'" *Id.* at 21–22. Realtime argues that the described portion of the '204 Patent is only an additional limitation to the established technological solution. (Doc. No. 37 at 22.) Further, Realtime maintains that claim 12 of the '204 Patent has specific processes for its "results and functions." *Id.* at 23.

As stated above, the court should be careful not to oversimplify a patent and its processes. *McRO*, 837 F.3d at 1313. Claim 12 of the '204 Patent is a method that analyzes stored data and selects an encoder based on the data, compresses the data, sends it through a machine, and transmits it. '204 Patent. These descriptors are more than a result-based patent and do not monopolize an abstract idea.

Similar to the other asserted patents, claim 12 of the '204 Patent is an inventive concept at step 2. Carbonite argues that claim 12 of the '204 Patent only gives a description of an

encoder without any sufficient inventive concept.  (Doc. No. 27 at 23.)  Further, Carbonite contends that the techniques used are well known.  *Id.*  Realtime counters that the claim solves technological problems by using a non-routine, unconventional compression system and method "to provide a multiplication of the communication-medium bandwidth, along with a reduction in the latency associated with data transmission of conventional systems."  (Doc. No. 37 at 27.)

Claim 12 of the '204 Patent presents an inventive concept.  The claim uses a specific method with various steps to provide faster transmission of data.  '204 Patent at 23:55–67.  Although the claim may use some known technology, the system as a whole creates an unconventional solution because it utilizes "data compression and decompression to provide data transfer . . . [and] reduce the latency of data transmission.  *Id.* at 5:39–43.  The patent provides "an improved system and method for providing secure point-to-point solution for transparent multiplication of bandwidth over conventional communication channels[.]"  *Id.* at 5:24–27 (describing the need for such a system due to the importance of receiving financial information over communication networks).  This establishes an inventive concept for an existing technological process.  *Amdocs*, 841 F.3d at 1300–01.  The components go past the well-understood and routine activities of the industry, and specify direct ways to fix issues in data transmission.  *Bascom*, 827 F. 3d at 1351.

Carbonite argues that the non-identified independent and dependent claims are analogous to claim 1 of the '204 Patent because they deal with limitations identified in the patent and they do no more than describe a desired function or outcome.  (Doc. No. 27 at 25.)  Carbonite further alleges that the independent and dependent claims do not form an inventive concept.  *Id.* at 24–27.  The claims here are directed to patent-eligible matter that provide an inventive concept

because they implement a specific method providing accelerated transmission of broadcast data. '204 Patent at 6:13–19.

For the reasons stated herein, the Court finds that claims 1–9 and 11–29 of the '204 Patent are directed to patent eligible subject matter and therefore **RECOMMENDS** that Carbonite's Motion (Doc. No. 27) be **DENIED** as to the asserted claims of the '204 Patent.

## CONCLUSION

For the reasons discussed herein, the Court **RECOMMENDS** that Carbonite's Motion to Dismiss (Doc. No. 27) be **DENIED**.

Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report. A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen (14) days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United States Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)**.**


So ORDERED and SIGNED this 20th day of September, 2017.


JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE